AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
By:     ALEXANDER J. WILSON
        Assistant United States Attorney
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel. (212) 637-2453


 UNITED STATES DISTRICT COURT
 SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA,
                                                    :
                    Plaintiff,
                                                    :     VERIFIED COMPLAINT FOR
            -v.-                                           FORFEITURE
                                                    :
$189,019.92  IN UNITED STATES CURRENCY                    20 Civ. ___ (___)
FORMERLY ON DEPOSIT AT CHEMICAL             :
BANK IN ACCOUNT NUMBER
172-062-4282-65  HELD IN THE NAME OF        :
SAB MEDICAL EQUIPMENT SALES CORP.,          :

$48,783.40  IN UNITED STATES CURRENCY       :
FORMERLY ON DEPOSIT AT CHEMICAL
BANK IN ACCOUNT NUMBER                      :
172-063-3648-65  HELD IN THE NAME OF
LECHIUM MEDICAL SUPPLY CORP.,               :

$294.00  IN UNITED STATES CURRENCY          :
FORMERLY ON DEPOSIT AT CHEMICAL
BANK IN ACCOUNT NUMBER                      :
294-061-802-01  HELD IN THE NAME OF
JOANNE DELPONTE BONANNO,                    :

$729.79  IN UNITED STATES CURRENCY          :
FORMERLY ON DEPOSIT AT CHEMICAL
BANK IN ACCOUNT NUMBER                      :
294-061-8024-65  HELD IN THE NAME OF
JOANNE DELPONTE BONANNO,                    :

$76,716.51  IN UNITED STATES CURRENCY       :
FORMERLY ON DEPOSIT AT SMITH
BARNEY IN ACCOUNT NUMBER                    :

101-25066-12  HELD IN THE NAME OF
STEVEN A. BONANNO,                                    :

$46,333.69  IN UNITED STATES CURRENCY          :
FORMERLY ON DEPOSIT AT SMITH
BARNEY IN ACCOUNT NUMBER                     :
101-30466-18  HELD IN THE NAME OF
STEVEN A. BONANNO, ACCOUNT FOR             :
MICHELLE BONANNO,

                                                     :

$53,072.52  IN UNITED STATES CURRENCY
FORMERLY ON DEPOSIT AT SMITH BARNEY      :
IN ACCOUNT NUMBER 101-30465-19  HELD IN
THE NAME OF STEVEN A. BONANNO,               :
ACCOUNT FOR NICOLE BONANNO,

                                                     :

                    Defendants in Rem.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff  United States of America, by its attorney Audrey Strauss, Acting United

States Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information  and belief, as follows:

## I.  NATURE OF THE ACTION

1.      This action is brought by the United States of America seeking the

forfeiture of all right, title and interest in:

   a.      $189,019.92  in United States Currency formerly on deposit at
     Chemical Bank in account number 172-062-4282-65  held in
     the name of SAB Medical Equipment  Sales Corp.;

   b.      $48,783.40  in United States Currency formerly on deposit at
     Chemical Bank in account number 172-063-3648-65  held in
     the name of Lechium Medical Supply Corp.;

c.    $294.00 in United States Currency formerly on deposit at Chemical Bank in account number 294-061-802-01 held in the name of Joanne Delponte Bonanno;

d.    $729.79 in United States Currency formerly on Deposit at Chemical Bank in account number 294-061-8024-65 held in the name Of Joanne Delponte Bonanno;

e.    $76,716.51 in United States Currency formerly on deposit at Smith Barney in account number 101-25066-12 held in the name of Steven A. Bonanno;

f.    $46,333.69 in United States Currency formerly on deposit at Smith Barney in account number 101-30466-18 held in the name of Steven A. Bonanno, account for Michelle Bonanno;

g.    $53,072.52 in United States Currency formerly on deposit at Smith Barney in account number 101-30465-19 held in the name of Steven A. Bonanno, account for Nicole Bonanno;

(a-g, collectively, the "Defendant Funds" and the "Defendant Accounts").

2.    The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because there is probable cause to believe that the Defendant Funds are property involved in or traceable to money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

4.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York, and pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b) because the Defendant Funds were found in the Southern District of New York.

3

5.      The Defendant Funds are presently in the Seized Asset Deposit Fund Account maintained by the United States Marshals Service.

### III.   PROBABLE CAUSE FOR FORFEITURE

#### A.  The Medicare Fraud

6.      On or about March 23, 1994, a nine count Criminal Complaint, 94 Mag. 544 (Docket No. 1, 94 Cr. 798 (JSM)) (the "Criminal Complaint") was filed in the United States District Court for the Southern District of New York charging Steven Bonanno, Harold Siegel, and Harry Ullrich (the "Defendants") with five counts of making false claims to Medicare, in violation of Title 18, United States Code, Sections 1001 and 2 (Counts One through Five), and four counts of mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2 (Counts Six through Nine). As set forth in greater detail in the complaint, the Defendants' criminal conduct involved a conspiracy to defraud Medicare by fraudulently obtaining reimbursements for the provision of durable medical equipment, and then laundering the proceeds of that scheme.

7.      Attached to the Criminal Complaint, and fully incorporated by reference therein, was the Affidavit of Special Agent Barry Jerson, of the Department of Health and Human Services ("HHS"), in Support of Application for Arrest, Search and Seizure Warrants (the "Jerson Affidavit").   The Jerson Affidavit provided evidence demonstrating probable cause that the Defendant Funds were subject to seizure and forfeiture.   Pursuant to seizure warrants issued by U.S. Magistrate Judge Leonard Bernikow on or about March 23, 1994, HHS seized the Defendant Funds.   The Criminal Complaint, along with its attached Jerson Affidavit, is attached

4

hereto as Exhibit A, and both are fully incorporated herein by reference.

8.     Bonanno, Siegel and Ulrich were all ultimately convicted of conspiracy to defraud the United States and to commit offenses against the United States which included (i) making false statements to the Department of Health and Human Services, in violation of Title 18, United States Code, section 1001; (ii) mail fraud, in violation of Title 18 United States Code, Section 1341; (iii) paying kickbacks to physicians to induce them to order medical equipment charged to Medicare, in violation of the Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b(b)(2); and (iv) money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(A); all in violation of Title 18, United States Code, Section 371.   Bonanno and Ulrich were also convicted of tax fraud, in violation of Title 26, United States Code, Section 7206(1), and Siegel was also convicted of a substantive violation of the Anti-Kickback Statute.

**B. The Defendant Funds**

9.     In the course of the scheme, the Defendants fraudulently obtained the following total payments from Medicare to various companies they controlled:

| Relevant Time Period | Name of Company | Appx. No. of Claims | Appx. Amount of Payments |
|---|---|---|---|
| 1/90-5/94 | Universal Medical Supplies, Inc. | 186 | $271,868 |
| 1/1/90-5/31/94 | Willis | 92,430 | $6,786,785.02 |
| 1/1/90-5/31/94 | SAB | 28,598 | $3,666,218.19 |

| 1/1/90-5/31/94 | Infinite | 48,917 | $2,357,865.12 |
| | | 170,131 | $13,082,736.33 |

10.     The Defendants initially deposited these payments in the following accounts:

| Account Number | Held in the Name of | Financial Institution |
|---|---|---|
| i. The "Universal #1 Account" | Universal Medical Supplies, Corp. | Chemical Bank |
| ii. The "Universal #2 Account" | Universal Medical Supplies, Corp. | Chemical Bank |
| iii. The "Uni-Med #1 Account" | Uni-Med Equipment Supply Corp. | Chemical Bank |
| iv. The "Uni-Med #2 Account" | Uni-Med Equipment Supply Corp. | Chemical Bank |
| v. The "SAB #1 Defendant Account"[1] | SAB Medical Equipment Sales Corp. | Chemical Bank |
| vi. The "SAB #2 Account" | SAB Medical Equipment Sales Corp. | Citibank |
| vii. The "Infinite Account" | Infinite Medical Supplies Corp. | Citibank |
| viii. The "Lexus Account" | Lexus Medical Supplies Corp. | Chemical Bank |

i.-viii., collectively, the "Medicare Claim Check Accounts."

11.     The Defendants subsequently laundered the funds from the Medicare Claim Check Accounts into and through numerous other bank and brokerage accounts (these accounts, and the Medicare Claim Check Accounts, collectively, the "Universal Accounts") held in the name of entities and individuals related to Universal, including Bonanno and Siegel,

---

[1] The SAB # 1 Defendant Account held the SAB #1 Defendant in Rem Funds.

knowing that the funds in the Medicare Claim Check Accounts contained the proceeds of unlawful activities (the "Money Laundering Fund Transfers"), in an effort to conceal their source and nature . The Defendants also promoted the continuing scheme by using the funds in the Universal Accounts to pay physicians to fraudulently sign Medicare Certificate of Medical Necessity Forms used in the scheme. The Defendant Accounts are among the accounts that were by the Defendants used to conceal the proceeds of the fraudulent scheme and to further promote that scheme.

## IV.   CLAIMS FOR FORFEITURE

### First Claim for Relief

### Forfeiture Under 18 U.S.C. § 981(a)(1)(A):
### Property Involved in Money Laundering in Violation of 18 U.S.C. §§ 1956 and 1957

12.     Paragraphs 1 through 11 of this Civil Complaint are repeated and re-alleged as if fully set forth herein.

13.      18 U.S.C. § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title, or any property traceable to such property."

14.     18 U.S.C. § 1956(a) imposes a criminal penalty on:

**(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

**(A)(i)** with the intent to promote the carrying on of specified unlawful activity…

7

(**B**) knowing that the transaction is designed in whole or in part—

(**i**)    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

15.    18 U.S.C. § 1957 imposes a criminal penalty on:

(**a**)    Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity[.]

16.    18 U.S.C. § 1956(c)(7)(A) provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title."

17.    Included among the enumerated offenses in 18 U.S.C. § 1961(1) is 18 U.S.C. § 1341 which provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" shall be subject to criminal penalty.

18.    The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a money laundering offense, in violation of 18 U.S.C. §§

8

1956 and 1957.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Funds and that all persons having an interest in the Defendant Funds be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
     June 23, 2020

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By:     _____

ALEXANDER J. WILSON
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2453

## **VERIFICATION**

STATE OF NEW YORK                                )
COUNTY OF NEW YORK                        :
SOUTHERN DISTRICT OF NEW YORK   )

      ROBERT M. CAPPADONA, being duly sworn, deposes and says that he is a

Supervisory Special Agent with the Federal Bureau of Investigation ("FBI"), and as such has

responsibility for the within action; that he has read the foregoing complaint and knows the

contents thereof, and that the same is true to the best of his knowledge, information, and belief.

      The sources of deponent's information and the ground of his belief are official

records and files of the FBI, information obtained directly by the deponent, and information

obtained by other law enforcement officials, during an investigation of alleged violations of Title

18, Title 26 and Title 42 of the United States Code.

ROBERT M. CAPPADONA
Special Agent
Federal Bureau of Investigation

Sworn to before me this
29 day of June , 2020

NOTARY PUBLIC

Charles Knapp
Notary Public, State of New York
No. 01KN6326453
Qualified in Suffolk County
Commission Expires, 6/15/20 2 3

# 94 MAG. 544

Approved: _____
GAINES H. CLEVELAND
Assistant United States Attorney

Before:   HONORABLE LEONARD BERNIKOW
United States Magistrate Judge
Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,           :        COMPLAINT

              - v -                 :        Violation of
                                             18 U.S.C. §§ 1001,
HAROLD SIEGEL,                      :        1341, and 2.
STEVEN BONANNO, and
HARRY ULLRICH,                     :        COUNTY OF OFFENSE:
                                             New York
                   Defendants.      :

------------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          BARRY JERSON, being duly sworn, deposes and says that
he is a Special Agent with the United States Department of Health
and Human Services Office of Inspector General and has been
designated as a Special Deputy United States Marshal for purposes
of this case, and charges as follows:

## COUNTS ONE THROUGH FIVE

### False Claims to Medicare Program

          1.    On or about the dates set forth below, in the
Southern District of New York and elsewhere, HAROLD SIEGEL,
STEVEN BONANNO, and HARRY ULLRICH, the defendants, in a matter
within the jurisdiction of a department and agency of the United
States, to wit, the United States Department of Health and Human
Services ("HHS"), unlawfully, willfully and knowingly made false,
fictitious and fraudulent statements and representations, and
made and used false writings and documents, to wit, Medicare
claim forms, knowing the same to contain false, fictitious and
fraudulent statements and entries, namely, that the durable

medical equipment claimed for reimbursement by Medicare had been properly determined to be medically necessary when in fact it had not, as follows:

| Count | Approx. Date of False Claim | Medicare Claim Number |
|-------|------------------------------|-----------------------|
| 1 | 6/10/92 | 92162602578 |
| 2 | 6/10/92 | 92162602263 |
| 3 | 6/25/92 | 92177610707 |
| 4 | 3/19/93 | 93078030146 |
| 5 | 3/19/93 | 93078070152 |

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT SIX THROUGH NINE

### Mail Fraud

2.    On or about the dates set forth below, in the Southern District of New York and elsewhere, HAROLD SIEGEL, STEVEN BONANNO, and HARRY ULLRICH, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, to wit, a scheme to defraud the Medicare program of payments for reimbursement of durable medical equipment that had not been properly determined to be medically necessary, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, did place in any post office and authorized depository for mail, and take and receive therefrom and knowingly caused to be delivered by mail according to the direction thereon, certain mail matter to be sent and delivered by the United States Postal Service as specified below in furtherance of the scheme to defraud:

| Count | Relevant Claim #s | Date of Check | Medicare Check # | Amount of Check |
|-------|-------------------|---------------|------------------|-----------------|
| 6 | 92162602578 92162602263 | 6/23/92 | 8134698 | $89,965.70 |
| 7 | 92177610707 | 7/8/92 | 81439720 | $ 8,573.37 |
| 8 | 93078030146 | 4/13/93 | 82902893 | $ 3,007.85 |
| 9 | 93078070152 | 4/13/93 | 82902892 | $ 1,795.76 |

(Title 18, United States Code, Sections 1341 and 2.)

The bases for my knowledge and for the foregoing charge are set forth in this complaint and in the affidavit attached hereto, which is fully incorporated herein by reference.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named individuals and that they be arrested and imprisoned or bailed as the case may be.

BARRY JERSON
Special Agent
Department of Health and Human Services

Sworn to before me this
MAR 2 3 1994 day of March, 1994

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

Leonard Bernikow
United States Magistrate Judge
S.D.N.Y.

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------x

IN THE MATTER OF THE APPLICATION         :

OF THE UNITED STATES OF AMERICA          :    AFFIDAVIT
                                              IN SUPPORT OF
FOR ARREST, SEARCH AND SEIZURE           :    APPLICATION FOR
                                              ARREST, SEARCH
WARRANTS FOR CERTAIN PERSONS,            :    AND SEIZURE
                                              WARRANTS_____
PREMISES AND PROPERTY.                    :

-----------------------------------------------x

STATE OF NEW YORK          )
COUNTY OF NEW YORK         : ss.:
SOUTHERN DISTRICT OF NEW YORK )

BARRY JERSON, being duly sworn, deposes and states:

## I. INTRODUCTION

1.   I am a Special Agent of the Department of Health
and Human Services ("HHS"), Office of Inspector General, where I
have been employed as a Special Agent since 1986.  I also have
been designated as a Special Deputy United States Marshal for
purposes of this case.  I have participated in more than 50
Medicare fraud investigations, including numerous cases involving
durable medical equipment ("DME") companies.  I also have
participated in the execution of numerous search warrants and
arrests in Medicare fraud cases.  In addition to my own personal
law enforcement training and experience, I have had discussions
with other law enforcement officials about the investigation of
Medicare fraud cases, the execution of search warrants, and the
seizures made pursuant to warrants in Medicare fraud cases.

2.   I make this affidavit in support of an application by the United States of America for:

(a)   arrest warrants for the following individuals: HAROLD SIEGEL, STEVEN BONANNO, and HARRY ULLRICH, for Medicare fraud, mail fraud, and other violations;

(b)   a search warrant for the following premises: Universal Medical Supplies, Inc., 30 N. West Street, Mt. Vernon, New York (the "PREMISES"); and

(c)   a seizure warrant for all funds, monies, negotiable instruments, and securities, including the contents of the following accounts:

(i)   account number 056-062-6168-65, in the name of Universal Medical Supplies, Corp., at the Chemical Bank branch located at 2126 White Plains Road, Bronx, New York (hereafter the "Universal #1" account);

(ii)   account number 056-062-6168-66, in the name of Universal Medical Supplies, Corp., at the Chemical Bank branch located at 2126 White Plains Road, Bronx, New York (hereafter the "Universal #2" account);

(iii)   account number 670-0027285, in the name of Universal Medical Supplies, Corp., at the Bank of New York branch located at Mount Vernon Avenue, Mount Vernon, New York (hereafter the "Universal #3" account);

(iv)   account number 056-063-4344-65, in the name of Uni-Med Equipment Supply Corp., at the Chemical Bank

2

branch located at 2126 White Plains Road, Bronx, New York
(hereafter the "Uni-Med #1" account);

    (v) account number 056-063-4344-66, in the
name of Uni-Med Equipment Supply, at the Chemical Bank branch
located at 2126, White Plains Road, Bronx, New York (hereafter
the "Uni-Med #2" account);

    (vi) account number 0027277, in the name of
Uni-Med Equipment Corp., at the Bank of New York branch located
at 150 Mount Vernon Avenue, Mount Vernon, New York (hereafter the
"Uni-Med #3" account);

    (vii) account number 172-062-4282-65, in the
name of SAB Medical Equipment Sales Corp., at the Chemical Bank
branch located at 984 N. Broadway, Yonkers, New York (hereafter
the "SAB #1" account);

    (viii) account number 06687499, in the name
of SAB Medical Equipment Sales Corp., at the Citibank branch
located at 114 7th Avenue, Brooklyn, New York (hereafter the "SAB
#2" account);

    (ix) account number 39972085, in the name of
Infinite Medical Supplies Corp., at the Citibank branch located
at 1010 Morris Park Avenue, Bronx, New York (hereafter the
"Infinite" account");

    (x) account number 766-064-4416-65, in the
name of Lexus Medical Supplies Corp., at the Chemical Bank branch
located at Route 9 and Lee Road, Jefferson Valley, New York
(hereafter the "Lexus" account");

3

(xi)  account number 172-063-3648-65, in the name of Lechium Medical Supply Corp., at the Chemical Bank branch located at 984 N. Broadway, Yonkers, New York (hereafter the "Lechium" account");

(xii)  account number 056-062-2496-65, in the name of Harold and Frances Siegel, at the Chemical Bank branch, located at 2126 White Plains Road, Bronx, New York (hereafter the "Siegel #1" account");

(xiii)  account number 680-14095, in the name of Mr. Harold Siegel and Mrs. Frances Siegel, at Merrill Lynch Pierce Fenner & Smith ("Merrill Lynch"), 15 Barstow Road, Great Neck, New York (hereafter the "Siegel #2" account");

(xiv)  account number 680-96145, in the name of Harold and Frances Siegel, at Merrill Lynch, 15 Barstow Road, Great Neck, New York (hereafter the "Siegel #3" account");

(xv)  account number 680-19068, in the name of Frances Siegel, at Merrill Lynch, 15 Barstow Road, Great Neck, New York, New York (hereafter the "Siegel #4" account");

(xvi)  account number 294-061-802-01, in the name of Joanne Delponte Bonanno, at the Chemical Bank branch, located at 1003 Lexington Avenue, New York, New York (hereafter the "Bonanno #1" account");

(xvii)  account number 294-061-8024-65, in the name of Joanne Delponte Bonanno, at the Chemical Bank branch, located at 1003 Lexington Avenue, New York, New York (hereafter the "Bonanno #2" account");

*[handwritten annotation:]* the brokerage office of which is located at

4

*[handwritten annotation:]* the administrative and financial offices of which are located at 2 Broadway, NY, NY 21st Floor

(xviii)   account number 101-25066-12, in the name of Steven A. Bonanno, at Smith Barney Shearson, 767 5th Avenue, New York, New York (hereafter the "Bonanno #5" account");

(xix)   account number 101-30466-18, in the name of Steven Bonanno account for Michelle Bonanno, at Smith Barney Shearson, 767 5th Avenue, New York, New York (hereafter the "Bonanno #6" account"); and

(xx)   account number 101-30465-19, in the name of Steven Bonanno account for Nicole Bonanno, at Smith Barney Shearson, 767 5th Avenue, New York, New York  (hereafter the "Bonanno #7" account").

## II.   BASES FOR FACTS CONTAINED IN THIS AFFIDAVIT

3.   I make this affidavit, in part, on personal knowledge based on my participation in this investigation and, in part, upon information and belief.  The sources of my information and belief include:

(a)   Oral and written reports about this and other investigations that I have received from fellow members of the HHS Office of Inspector General and from agents of the Federal Bureau of Investigation ("FBI"); and

(b)   A review of files and documents furnished to HHS by Empire Blue Cross and Blue Shield relating to Universal Medical Supplies, Inc., and its related companies[1] (hereafter

---

[1]   As further explained below, see ¶¶ 11-12, infra, Universal Medical Supplies, Inc., is one of several related DME companies, including Willis Surgical Supply Co., d/b/a Uni-Med Equipment Corp.; SAB Medical Equipment Sales Corp.; Lexus Medical Supply

referred to collectively as "Universal"), including Medicare reimbursement claim forms submitted by Universal and complaints received from Medicare beneficiaries;

(c)   Interviews with Medicare beneficiaries to whom  Universal purportedly supplied durable medical equipment for which Universal sought reimbursement from Medicare;

(d)   Debriefings of three confidential informants ("CI-1," "CI-2," and "CI-3") who worked in conjunction with Universal:

(i)   CI-1 worked for Universal soliciting persons with Medicare numbers for Universal to use in seeking reimbursement from Medicare.  CI-1 has been providing information to HHS since approximately September 1992.  CI-1, who has no prior record, is cooperating with the Government.  Information that CI-1 has provided concerning a related investigation has proved reliable, and much of the information CI-1 has furnished in the instant investigation has been corroborated;

(ii)   CI-2 is a physician who authorized durable medical equipment for Medicare beneficiaries for which Universal sought reimbursement.  CI-2 has been providing information to HHS since approximately April 1993.  CI-2, who has no prior record, is cooperating with the Government.  Much of the

---

Corp.; and Infinite Medical Supplies, Inc.  Except as otherwise noted, for purposes of this affidavit, these related companies will be referred to collectively as "Universal."  Unless otherwise noted, when Universal Medical Supplies, Inc., is discussed as a separate company, it will be referred to by its full name.

information provided by CI-2 in the instant investigation has been corroborated; and

(iii)  CI-3 is a former employee of Universal who worked at the PREMISES.  CI-3 worked in DME sales and responded to telephone calls from Medicare beneficiaries.  CI-3 has been providing information to HHS since approximately March 1993.  CI-3, who has no prior record, is cooperating with the Government.  Much of the information provided by CI-3 in the instant investigation has been corroborated;

(e)  Records retained by CI-1 and CI-3 relating to the period of their employment with Universal;

(f)  Records obtained from banks and other financial institutions doing business with Universal and its principal employees, including records from Manufacturers Hanover Trust, d/b/a Chemical Bank; Bank of New York; Citibank, N.A.; Merrill Lynch Pierce Fenner & Smith; Dean Witter Reynolds; and Smith Barney Shearson; and

(g)  Postal records obtained from the United States Postal Service; and

(h)  Physical surveillance conducted by HHS and FBI agents.

4.  Because this affidavit is being submitted for the limited purpose of seeking warrants for the arrest, search and seizure of certain persons, premises and property, I have not set forth each and every fact learned during the course of this investigation.  Facts not set forth herein are not being relied

7

upon in reaching my conclusion that warrants should be issued. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this application.

### III.   THE MEDICARE PROGRAM

5.   The Medicare program, enacted by Congress in 1965, provides for basic insurance coverage of in-hospital and out-patient medical services, doctors' services, and medical supplies (including durable medical equipment) for individuals age 65 and older and to certain disabled persons. Insurance benefits are paid out of a trust fund, which is funded by appropriations from the United States Treasury and by premiums paid by those persons age 65 and older or disabled who enroll in the Medicare program. Persons eligible to receive benefits under the Medicare program are assigned a Medicare number that providers must use in submitting reimbursement claims for services provided to Medicare beneficiaries. Among the benefits available under the Medicare program is durable medical equipment -- such as hospital beds, wheelchairs, patient lifts, and lumbar sacral supports -- certified by a physician as medically necessary for the Medicare beneficiary.

6.   By contract with HHS, Empire Blue Cross and Blue Shield ("Empire") is responsible for administering the Medicare program in various New York counties, including New York, Bronx, Kings, Richmond, and Westchester counties. Empire approves and pays claims filed by Medicare providers, such as physicians and DME suppliers, for covered services and products.

8

7.  To make a claim for Medicare reimbursement, a provider must complete and submit a Medicare Health Insurance Claim, HCFA form 1500 ("claim form"). Each claim form contains a certification that the services shown on the form were medically necessary and were provided by the supplier. Claims submitted by DME suppliers must be accompanied by a Certificate of Medical Necessity, certifying that a physician has authorized the durable medical equipment for the Medicare beneficiary. The completed claim forms are received by Empire at its Crompond, New York facility, which is located in Westchester County, New York.

8.  Upon receipt of a claim form submitted by a DME supplier, Empire assigns a number to each claim. Periodically, Empire issues a Medicare reimbursement check by United States mail to the DME supplier.

9.  After Empire mails payment checks to the DME supplier based on claim forms submitted for reimbursement, Empire mails an Explanation of Medicare Benefits form to the beneficiaries listed on the claim forms. The Explanation of Medicare Benefits form sets forth information concerning the benefits provided to the beneficiary, including the name of the DME supplier and the equipment paid for by Medicare. The form directs the beneficiaries to contact Empire by telephone with any questions or complaints.

9

## IV.   THE INVESTIGATION

10.   This investigation began as a result of a referral from Empire advising HHS that Empire had reason to believe that Universal was submitting fraudulent claims for Medicare reimbursement of DME equipment.   Empire advised HHS that it had received a substantial number of unsolicited complaints from Medicare beneficiaries who denied receiving durable medical equipment for which Universal had submitted Medicare reimbursement claims.   Based on the referral, HHS initiated this investigation with assistance from the FBI.   The following is a description of (a) Universal Medical Supplies, Inc., and its related companies; (b) the Medicare fraud and mail fraud scheme that Universal engaged; and (c) the money-laundering activities that followed Universal's receipt of the proceeds of the Medicare fraud and mail fraud scheme.

### A.   Universal Medical Supplies, Inc., and Related Companies

11.   According to Empire records, Universal Medical Supplies, Inc., is owned by HAROLD SIEGEL and the address of the company is 30 N. West Street, Mt. Vernon, New York (the PREMISES address).   Empire records show that, prior to 1992, Universal Medical Supplies, Inc., was located at One Odell Plaza, Yonkers, New York, which is the same address used by a related DME company -- Willis Surgical Supply, d/b/a Uni-Med Equipment Corp., see ¶ 12(a), infra.   Records obtained from the Bank of New York list HAROLD SIEGEL as the president of Universal Medical Supplies, Inc., and Frances Siegel as secretary, with a home address for

10

both of 20 Waterside Close, Eastchester, New York.  According to
CI-3, who worked at the PREMISES address and at the previous
location (One Odell Plaza, Yonkers, New York), HAROLD SIEGEL was
the principal owner and operator of Universal; STEVEN BONANNO
handled day-to-day management of Universal, including computer
operations and billing; and HARRY ULLRICH handled the supply
operations.  Records obtained from Bank of New York for Universal
Medical Supplies, Inc., show regular weekly payments to HAROLD
SIEGEL, STEVEN BONANNO, HARRY ULLRICH, and Paul Wasilewski, among
others.  The Universal Medical Supplies, Inc., account from which
these payments was made was funded almost entirely by deposits
from a Universal Medical Supplies, Inc., account at Chemical
Bank.

      12.  Based on the facts set forth below, among others,
HAROLD SIEGEL also operates, directly or indirectly, several
related DME companies, including Willis Surgical Supply, which
does business under the name Uni-Med Equipment Corp. (hereafter
"Willis"); SAB Medical Equipment Sales Corp. ("SAB"); Infinite
Medical Supplies, Inc. ("Infinite"); and Lexus Medical Supply
Corp. ("Lexus"):

      (a)  Willis lists its address with Empire as 820
Post Road, Suite 247, Scarsdale, New York.  Surveillance has
shown that this address is a postal box location.  According to a
postal application obtained from the United States Postal
Service, the persons authorized to receive mail for Willis are
HAROLD SIEGEL, STEVE BONANNO, HARRY ULLRICH, Craig Siegel, Jack

11

Roberts, and Frances Roberts.  Medicare checks made payable to Willis are cashed using a stamp bearing the legend: "Willis Surgical Supply d/b/a Uni-Med."  As noted above, see ¶ 11, supra, prior to 1992, Empire records show both Universal Medical Supplies, Inc., and Willis as being located at the same address: One Odell Plaza, Yonkers, New York.  Bank records obtained for a Willis account at MHT list Jack Roberts and Frances Roberts as co-signatories, with a home address of 20 Waterside Close, Eastchester, New York, which is the same home address that HAROLD SIEGEL and Frances Siegel listed on bank records for Universal Medical Supplies, Inc. (see ¶ 11, supra).  As described more fully below, see ¶ 19, infra, HAROLD SIEGEL used checks drawn on a Willis account at MHT to pay CI-2 for improperly signing Certificate of Medical Necessity forms for durable medical equipment that Universal billed to the Medicare program.  SIEGEL also used the same Willis account to fund a SAB account at MHT.

(b)   SAB obtained authorization from Empire to operate as an approved DME supplier as of June 1991.  SAB's application for Medicare approval was supported by a letter of reference from HAROLD SIEGEL of Universal Medical Supplies, Inc. The application for Medicare approval lists STEVEN BONANNO as owner and president of SAB, and Joanne Delponte Bonanno as vice president and secretary.  The only employees listed for SAB are Paul Wasilewski, who also was listed as an employee for Infinite and Universal, see ¶¶ 11 & 12(c), and Evelyn Bonanno, who on information and belief is the mother of STEVEN BONANNO.  The

12

address shown on the application for Medicare approval (395 Third Street, Brooklyn, New York) is the same address listed as the home address of STEVEN BONANNO on an account application with Dean Witter Reynolds, Inc.  In the Dean Witter application, dated December 1992, BONANNO lists his only employment as Manager of Universal Medical Supplies, Inc.  As of July 1993, BONANNO continued to receive regular weekly payments from Universal Medical Supplies, Inc.  As noted above, see ¶ 12(a), supra, a SAB bank account at MHT was funded by a check from a Willis account at MHT.  In addition to receiving claims from SAB for Medicare reimbursement, Empire also received copies of delivery slips for SAB, purportedly showing that the Medicare beneficiaries had received the items listed on the form.  These delivery slips are identical to those submitted by Universal Medical Supplies, Inc. except that the name SAB appears at the top of the form and the reference to Universal Medical Supplies, Inc., has been crossed out in ink.

(c)  Infinite obtained authorization from Empire to operate as an approved DME supplier as of February 1992.  The application for Medicare approval lists HARRY ULLRICH as president and Winifred Cherry as vice president and secretary of Infinite.  Surveillance has shown that the address listed on the application for Medicare approval (701 N. MacQuesten Parkway, Suite 143, Mount Vernon, New York 10552) is a postal box location.  As noted above, see 12(a), supra, HARRY ULLRICH is among the persons authorized to receive mail on behalf of Willis.

13

The only employees that Infinite listed are Paul Wasilewski, who also was listed as an employee for Universal Medical Supplies, Inc., and Willis, see ¶¶ 11 & 12(b), supra, and James Stern, who also was listed as an employee for Lexus, see ¶ 12(d), infra. Bank records show that the Infinite account at Citibank was funded by a $100,000 deposit drawn on a Universal Medical Supplies, Inc., account at MHT.

(d) Lexus received authorization from Empire to operate as an approved DME supplier as of September 1992. The application for Medicare approval lists the president and owner of Lexus as Craig Siegel, who on information and belief is the son of HAROLD SIEGEL, and lists Rosanne Ortholano, as vice president and secretary. The service address shown on the application for approval (22 Bonie Wood Drive, Mahopac, New York) is on information and belief the home address for Craig Siegel. As noted above, see 12(a), supra, Craig Siegel is among the persons authorized to receive mail on behalf of Willis. The employees listed for Lexus include James Stern, who also was listed as an employee for Infinite, see ¶ 12(c), supra.

## B.  The Medicare and Mail Fraud Scheme

13.  This investigation was initiated after a substantial number of Medicare beneficiaries complained to Empire that they never received the durable medical equipment listed on their Explanation of Medicare Benefits form as having been delivered to them by Universal.  As set forth below, a substantial amount of the durable medical equipment that

14

Universal billed to Medicare was never delivered to the beneficiaries, and Universal often provided non-reimbursable substitute items instead of reimbursable durable medical equipment. The following is a description of (1) the false Medicare reimbursement claims that Universal submitted to Empire, and (2) Empire's payment by United States mail of the false Medicare claims that Universal submitted for reimbursement.

### 1. False Medicare Claims Submitted to Empire

14. As described below, Universal (a) provided Medicare beneficiaries non-approved items as an inducement for beneficiaries to allow Universal to use their Medicare numbers to submit reimbursement claims to Empire; (b) prepared and submitted false Certificate of Necessity forms, purportedly authorizing the durable medical equipment that Universal billed to Medicare; and (c) billed Medicare for durable medical equipment that Universal never delivered to the beneficiaries.

#### a. Providing Non-Reimbursable Items in Exchange for Medicare Numbers

15. According to CI-1 and CI-3, whom HAROLD SIEGEL and others recruited to serve as Universal sales representatives, Universal was able to attract the interest of Medicare beneficiaries by providing non-reimbursable items in order to induce the beneficiaries to give Universal their Medicare number. As described below, although Universal provided beneficiaries with non-reimbursable items, more expensive reimbursable durable medical equipment would be billed to Empire using the beneficiaries' Medicare number. The non-reimbursable items

15

provided to the beneficiaries generally consisted of household items, ranging from angora underwear and power massagers to air-conditioners and microwaves. According to CI-1 and CI-3, Medicare beneficiaries would contact Universal and its sales representatives to learn how they could obtain the "free" household items that Universal had to offer. During the period when CI-3 regularly worked at the PREMISES, CI-3 would receive telephone calls from Medicare beneficiaries and would schedule visits to the beneficiaries' homes. The Universal sales representatives would then visit the Medicare beneficiaries in their homes and bring with them catalogs showing the items that Universal had to offer, including non-reimbursable household items. In some instances, the Universal sales representatives, such as CI-1, would visit the beneficiaries in the company of a doctor, and in other instances, the sales representative, such as CI-3, would go alone, see ¶¶ 19 & 20, infra. According to CI-1 and CI-3, upon visiting the Medicare beneficiaries, the Universal sales representative would obtain orders from the beneficiaries and often would provide the beneficiaries with nominal value household items, such as angora underwear, during the visits.

16. When CI-3 began working at Universal, the company was able to attract the interest of many Medicare beneficiaries by providing them with non-reimbursable air-conditioners. In the fall of 1991, CI-3 attended a sales meeting at a conference room at the PREMISES when Universal announced its intention to begin offering non-reimbursable microwave ovens

instead of air-conditioners.  The sales meeting -- which was
attended by the Universal sales staff and representatives of
Universal's management, including HAROLD SIEGEL, STEVEN BONANNO,
and HARRY ULLRICH -- was primarily conducted by STEVEN BONANNO,
although HAROLD SIEGEL and HARRY ULLRICH also made presentations.
According to CI-3, the purpose of the meeting was to introduce
new products for Universal's "Fall Campaign" and to encourage
Universal sales representatives to boost their sales.

17.  According to CI-3, in order to record the orders
received from beneficiaries, Universal provided its sales
representatives with a form that consisted of a Universal
delivery receipt, over which an order form was stapled.  Pursuant
to Universal's instructions, when CI-3 visited Medicare
beneficiaries, CI-3 would complete the order portion of the form,
noting the items that the Medicare beneficiaries requested,
including the non-reimbursable household items.  CI-3 would then
return the completed forms to the PREMISES, usually providing the
forms to STEVEN BONANNO.  The order forms would be used to fill
the beneficiaries' request for household and other items, and the
beneficiaries would be asked to sign the delivery receipt portion
of the form upon obtaining the requested items.  According to CI-
3, when Universal would submit Medicare reimbursement claims to
Empire, the Universal representative would remove the stapled
order portion of the form listing the household and other items
delivered, and the reimbursable items actually billed to Empire
-- but not delivered to the beneficiaries -- would be listed

17

along with the beneficiaries' signature, making it appear that
the beneficiaries had certified their receipt of the reimbursable
items billed, rather than the non-reimbursable items actually
delivered.

### b. Preparing and Submitting False Certificate of Necessity Forms

18.  In order to obtain reimbursement from Empire for
durable medical equipment, Universal was required to submit a
Certificate of Medical Necessity form, reflecting that a
physician had certified that the durable medical equipment was
medically necessary for the beneficiary.  According to CI-1 and
CI-3, HAROLD SIEGEL identified and recruited medical doctors,
such as CI-2, who were willing to sign Certificate of Medical
Necessity forms without properly determining that the durable
medical equipment they authorized was actually medically
necessary.  As noted above, see ¶ 15, in some instances, the
doctors, such as CI-2, would visit Medicare beneficiaries in the
company of a Universal sales representative, such as CI-1.  In
other instances, the sales representative, such as CI-3, would
visit the Medicare beneficiaries alone, without a doctor.

19.  In order to obtain the signature required to
accompany the Certificate of Medical Necessity forms submitted in
support of Universal's Medicare reimbursement claims, SIEGEL
periodically would visit CI-2's office to have CI-2 sign batches
of Certificate of Medical Necessity forms, authorizing durable
medical equipment for the Medicare beneficiaries.  SIEGEL told
CI-2 that there were 10-15 other doctors who also were involved

18

in signing Certificate of Medical Necessity forms for Universal.
At the time SIEGEL presented the forms to CI-2 for signature,
these Medicare Certificate of Medical Necessity forms were either
completely blank or contained completed descriptions of the
durable medical equipment to be authorized.  (According to CI-2,
the only DME company name that ever appeared on the forms at the
time CI-2 signed the forms was Universal.  However, Empire has
received a number of forms bearing CI-2's signature, which were
completed with the names of other DME suppliers, such as
Infinite, Willis, and SAB.).  According to CI-2, SIEGEL was aware
that CI-2 did not consult any medical records for the patients at
the time CI-2 signed the forms and that CI-2 made no effort to
determine whether the durable medical equipment authorized was
medically necessary.  Eventually, after the number of Certificate
of Medical Necessity forms that SIEGEL asked CI-2 to sign
increased, CI-2 complained that SIEGEL was asking CI-2 to sign
too many forms.  To help compensate CI-2 for this added risk,
SIEGEL then began making payments to a third party that CI-2
designated.  These payments included checks signed by SIEGEL
drawn on a Universal Medical Supplies, Inc., account at MHT Bank
and checks signed in the name of Jack Roberts drawn on a Willis
account at MHT.

     20.  In the instances when Universal sales
representatives would visit the Medicare beneficiaries without a
doctor, the sales representative, such as CI-3 (who has no
medical training), would obtain rudimentary information about the

medical history of the beneficiary that would be noted on a patient history form that Universal furnished to the sales representative.  According to CI-3, STEVEN BONANNO and HARRY ULLRICH were primarily responsible for instructing CI-3 at the PREMISES about what medical information to obtain from the beneficiaries.  (Neither BONANNO nor ULLRICH has any formal medical training of which CI-3 is aware.).

21.    While working at the PREMISES, CI-3 observed STEVEN BONANNO prepare documents that appeared to be medical records for the Medicare beneficiaries, using the patient history information supplied by the Universal sales representatives.  The information was compiled in file folders, with a separate file folder for each beneficiary.

22.    Periodically, according to CI-3, HAROLD SIEGEL would make regular visits to the physicians -- in what was known at Universal as the "Tour of the Week" -- to deliver the completed medical records that STEVEN BONANNO had prepared and obtain the signature of the physicians on the Certificate of Medical Necessity forms, certifying that the durable medical equipment listed was medically necessary for the Medicare beneficiaries.  SIEGEL would then return to the PREMISES location with the completed Certificate of Medical Necessity forms, so that Universal could  submit Medicare reimbursement claims for the durable medical equipment to Empire.

23.    According to CI-3, after HAROLD SIEGEL obtained the signature of CI-2 and other physicians on the Certificate of

20

Medical Necessity forms, Universal submitted Medicare reimbursement claims for the durable medical equipment.  Records obtained from Empire show that the Medicare claims that Universal submitted to Empire include reimbursement claims for durable medical equipment supported by Certificate of Medical Necessity forms signed by CI-2, which according to CI-2, SIEGEL knew had been improperly authorized.  These claims included claims that Universal submitted to Empire on the following approximate dates which were assigned the following Medicare claim numbers:  claim numbers 92162602578 and 92162602263, received on or about June 10, 1992; claim number 92177610707, received on or about June 25, 1992; and claim numbers 93078030146 and 93078070152, received on or about March 19, 1993.  As set forth below, see ¶ 29, infra, based on these and other false claims that Universal submitted, Empire prepared Medicare checks that were mailed to Universal and were deposited into various bank accounts under Universal's control.

### c.    Billing Medicare for DME Never Delivered to the Beneficiaries

24.  As described above, see ¶ 17, supra, according to CI-3, Universal would use the top portion of the delivery receipt as an order form to determine what household and other items to supply to the Medicare beneficiaries from its warehouse located at the PREMISES or from other sources of supply.  Upon delivery of the items listed on the order form, the Medicare beneficiaries were instructed to sign the delivery receipt, and the form was returned to Universal at the PREMISES.  The top portion of the

delivery receipt was then removed from the form and the bottom portion was completed to reflect the reimbursable items that would be billed to Medicare, which often were never provided to the beneficiaries.

25.   According to CI-3, STEVEN BONANNO handled most of Universal's billings to Empire, using computer facilities at the PREMISES.  Empire records show that Empire typically received Universal's claims for reimbursement electronically and the corresponding Certificate of Medical Necessity forms were received separately.

26.   As described above, see ¶ 9, supra, upon payment of a Medicare reimbursement claim, Empire mails an Explanation of Medicare Benefits form to the beneficiary listed on the claim forms.  The Explanation of Medicare Benefits form sets forth information concerning the benefits that Empire's records indicate were provided to the beneficiary, including the name of the DME supplier and the equipment paid for by Medicare.  The form directs the beneficiaries to contact Empire by telephone with any questions or complaints.

27.   As noted above, see ¶ 10, supra, Empire has received a substantial number of complaints from Medicare beneficiaries that they did not receive the durable medical equipment listed in their Explanation of Medical Benefits forms as having been provided by Universal.  To illustrate the extent of these unsolicited complaints, the following table shows the approximate amount of total payments that Empire made to

Universal for durable medical equipment that beneficiaries complained to Empire that they had never received:

### COMPLAINTS RECEIVED BY EMPIRE

| Relevant Time Period | Name of Company | Approximate Number of Complaints | Approximate Amount of Overpayment |
|---|---|---|---|
| 1/90-2/94 | Universal Medical Supplies, Inc. | 186 | $ 271,868 |
| 1/91-2/94 | Willis | 133 | 682,805 |
| 6/91-2/94 | SAB | 162 | 403,937 |
| 2/92-2/94 | Infinite | 76 | 184,964 |
| | | 557 | $1,543,575 |

The above table includes only information Empire provided concerning those Medicare beneficiaries who made an effort on their own to contact Empire after receiving their Explanation of Medical Benefits form, showing items that Universal purportedly delivered.  As explained below, see ¶ 28, infra, there is reason to believe the actual number of beneficiaries who never received the durable medical equipment that Universal billed to Medicare is substantially higher, and the amount of overpayments to Universal is therefore significantly greater than the table (which includes only information based on complaints Empire received) reflects.

28.  As part of its investigation, HHS and FBI agents began interviewing Medicare beneficiaries who complained to Empire that they never receive the durable medical equipment

listed in their Explanation of Medicare Benefits form as having been delivered by Universal.  In order to begin to determine the extent of the nondeliveries beyond just those Medicare beneficiaries who made the effort to contact Empire, HHS and FBI agents also began interviewing Medicare beneficiaries who had been selected randomly from among the beneficiaries whose Medicare numbers appeared in the billings for Universal.  Based on HHS and FBI interviews with Medicare beneficiaries, there is reason to believe that a substantial amount of durable medical equipment for which Universal sought reimbursement was never delivered to the beneficiaries.  Instead of receiving the durable medical equipment that was billed to Medicare, many of the Medicare beneficiaries told HHS and FBI agents that they were given non-reimbursable items, such as angora underwear, exercise bicycles, power massagers, air-conditioners, and microwaves, in exchange for use of their Medicare number.  In many such instances, Empire records show that Universal submitted Medicare reimbursement claims stating that Universal had delivered reimbursable equipment, such as hospital beds, wheelchairs, patient lifts, and lumbar sacral supports, when the Medicare beneficiaries denied receiving any such equipment.  As set forth below, see ¶ 29, infra, based on these false claims that Universal submitted, Empire prepared and mailed Medicare checks to Universal that Universal then deposited into various bank accounts under Universal's control.

**24**

### 2.  Payment for False Claims by Mail

29.  Based on its receipt of Medicare claim forms that Universal submitted for reimbursement, Empire periodically issued Medicare reimbursement checks to Universal by United States mail for the durable medical equipment that Universal claimed to have delivered to Medicare beneficiaries.  The Medicare reimbursement checks that Empire mailed to Universal include checks in payment for the false claims described in ¶¶ 23 & 28 supra.  Upon receiving the Medicare checks in payment for the false claims, Universal then deposited the checks to various bank accounts under its direction and control, including the following accounts previously identified in ¶ 2(c), supra, and further described below, see ¶ 32, infra:

> (a)  the Universal #1 account,
>
> (b)  the Universal #2 account,
>
> (c)  the Uni-Med #1 account,
>
> (d)  the Uni-Med #2 account,
>
> (e)  the SAB #1 account,
>
> (f)  the SAB #2 account,
>
> (g)  the Infinite account, and
>
> (h)  the Lexus account.

Among the false claims for which Universal received Medicare reimbursement checks by United States mail are the claims identified by claim number in paragraph 23, supra, including claim number 92162602578 and 92162602263, paid by Medicare check number 8134698, in the amount $89,965.70, mailed

on or about June 23, 1992; claim number 92177610707, paid by Medicare check number 81439720, in the amount of $8,573.37, mailed on or about July 8, 1992; claim number 93078030146, paid by Medicare check number 82902893, in the amount of $3,007.85, mailed on or about April 13, 1993; and claim number 93078070152, paid by Medicare check number 82902892, in the amount of $1,795.76, mailed on or about April 13, 1993.

### C.  The Money Laundering Scheme

30.  As described below, after receiving Medicare reimbursement checks by United States mail, Universal in turn caused funds from those checks to be transferred to various bank and other accounts under Universal's direction and control.

31.  In connection with this investigation, I have reviewed documents subpoenaed from numerous banks and other financial institutions in an effort to trace the path of the proceeds of the Medicare fraud and mail fraud scheme.  While I have received numerous records pursuant to grand jury subpoena, certain documents called for by grand jury subpoena have not been received to date.

32.  Based on a review of the bank and other financial records, the investigation has determined that funds in these accounts were subsequently transferred by check to numerous other bank and brokerage accounts held in the name of individuals and entities related to Universal.  The individuals involved in the fraud used Universal and its bank accounts to provide a cover of

legitimacy for its illegal conduct and a means to promote its
unlawful activities.  The transactions related to these accounts
are summarized in a chart that appears as an appendix to this
affidavit, see Appendix (attached hereto), and in the paragraph
that follows, which provides a description of typical account
activity relating to the Universal accounts, see ¶ 33, infra.
The attached appendix shows the eight related Universal accounts
into which Medicare checks received on the basis of fraudulent
claims described in paragraphs 23 and 28 supra were deposited.
See Appendix.  The chart also shows transfers (indicated by
arrows) between these accounts, including transfers from the Uni-
Med #2 account to the Uni-Med #1 account, from the Lexus account
to the Universal #1 account, and from the Infinite to the SAB #2
account, see ¶ 33 infra.  In addition to the transfers between
the accounts into which the Medicare funds were directly
deposited, the chart also shows transfers from the accounts into
which the Medicare funds were deposited into other related
Universal accounts, including transfers from the Universal #1
account to the Universal #3 account, from the Uni-Med #1 account
to the Uni-Med #3 account, and from the SAB #2 account to the
Lechium account, see id.  The chart also shows transfers from the
Universal accounts into which the Medicare funds were directly
deposited to other accounts under the control of principals of
Universal, including transfers from the Universal #1 account, the
Universal #2 account, the Infinite account, and the Uni-Med # 1
account to the Siegel #1 account; and transfers from the SAB #1

27

account to the Bonanno #1 account, see id. In addition, the
chart shows transfers from accounts into which these Medicare
funds were transferred to personal accounts under the control of
Universal principals, including transfers from the Siegel #1
account to other Siegel accounts and from the Bonanno #1 to other
Bonanno accounts. See id. As the chart shows, each of the 20
accounts received Medicare funds that Universal received based on
the Medicare and mail fraud described in paragraphs 23 and 28
supra.

33. Among the bank and brokerage accounts under the
direction and control of Universal or its principals are the
following accounts:

(a)   The Universal #1 account -- According to
Chemical Bank records, this account was opened by HAROLD SIEGEL
on or about December 27, 1988. In addition to receiving Medicare
reimbursement checks based on false claims, see ¶ 29, supra, this
account was used to fund other accounts and employee payroll, and
to receive transfers from related accounts, according to bank
records. For example, between December 1992 and March 1993,
approximately $281,793 was transferred to this account from the
SAB #1 account. In the month of January 1992, the account
received approximately $150,000 from the Universal #2 account.
Between July 1991 and December 1991, the account received
approximately $748,879 from the Uni-Med #2 account. On or about
October 26, 1993, approximately $79,425 was received from the
Lexus account. In or around April 1992, the account received

28

approximately $141,798 from a Universal account at Smith Barney. In or about June 1991, approximately $26,332 from this account was deposited into the Universal Smith Barney account. Approximately $30,000 from this account was used to fund the opening of the Universal #3 account, and an average of approximately $68,000 per month has been transferred from this account to the Universal #3 account. Based on the account activity, this account appears to have been used as the payroll account for Universal prior to the opening of the Universal # 3 account.

(b) The Universal #2 account -- This account was opened on or about October 9, 1987, by HAROLD SIEGEL and another individual, according to Chemical Bank records. In addition to receiving Medicare reimbursement checks based on false claims, see ¶ 29, supra, this account was used to fund other Universal accounts and to receive transfers from related accounts. For example, during the period from November 1990 through June 1991, four checks totalling approximately $860,000 from this account were deposited into the Siegel #1 account. Between June 1991 and January 1992, three checks totalling approximately $1,026,317 were deposited into this account from the Uni-Med # 2 account. In or about May 1991, two transfers totalling approximately $104,000 from this account were made to the Universal Smith Barney account. In or about January 1992, approximately $100,000 from this account was transferred to the Infinite account.

(c)   The Universal #3 account -- According to Bank
of New York records, this account was opened by HAROLD SIEGEL and
Frances Siegel on or about February 12, 1992.  The account was
funded with an opening deposit of approximately $30,000 from the
Universal # 1 account.  All subsequent deposits to the account
have come from the Universal #1 account, at an average monthly
rate of approximately $68,000.  The account is believed, based on
checking activity, to be used as the payroll account for
Universal.

(d)   The Uni-Med #1 account -- This account was
opened on June 27, 1989, with Jack Roberts and Frances Siegel as
signatories, according to Chemical Bank records.  In addition to
receiving Medicare reimbursement checks based on false claims,
see ¶ 29, supra, the account was used to fund employee payroll
and other Universal accounts as well as to receive transfers from
related accounts.  For example, during the period December 1991
and January 1992, approximately $300,000 was transferred into
this account from the Uni-Med #2 account.  Another account --
Uni-Med #3 -- was opened with a $20,000 deposit from this
account.  An average of approximately $30,000 per month has been
transferred from this account to the Uni-Med #3 account.
Additionally, this account has received approximately $19,000
from the Uni-Med #3 account.  From May 1993 to December 1993,
approximately $298,599 from this account was transferred to the
Universal #1 account.  On an monthly basis, an average of
approximately $2,500 was sent to the Siegel #1 account in checks

30

payable to Frances Roberts.  Based on account activity, the account is believed to have been used as the payroll account prior to the opening of a Uni-Med account at the Bank of New York.

(e)   The Uni-Med #2 account -- This account was opened on February 11, 1991, with Jack Roberts and Frances Roberts as signatories, according to Chemical Bank records.  In addition to receiving Medicare reimbursement checks based on false claims, see ¶ 29, supra, this account was used to fund related accounts.  For example, during the months of December 1991 and January 1992, approximately $300,000 was transferred from this account to the Uni-Med #1 account.  In December 1991, approximately $110,000 was transferred from this account to the SAB # 1 account.  Between July 1991 and December 1991, approximately $748,879 was transferred from this account to the Universal #1 account; during the same period, approximately $1,026,317 was transferred from this account to the Universal #2 account.

(f)   The Uni-Med #3 account -- According to Bank of New York records, this account was opened on or about February 12, 1992, with Frances Roberts and Jack Roberts as the signatories.  Based on account activity, the account appears to be used as a payroll account.  This account was opened with a $20,000 deposit from the Uni-Med #1 account, and all subsequent deposits have come from the Uni-Med #1 account.

31

(g)  **The SAB #1 account** -- According to Chemical
Bank records, this account was opened on or about February 25,
1991, with STEVEN BONANNO and Joanne Bonanno as the signatories.
In addition to receiving Medicare reimbursement checks based on
false claims, see ¶ 29, supra, this account was used to fund
other accounts and to receive transfers from related accounts.
For example, between January 1992 and March 1993, approximately
$549,845 from this account was transferred to the Universal #1
account.  Approximately $50,000 was transferred from this account
to the Infinite account in September 1992.  The Bonanno #1
account was opened with a $15,108 deposit drawn from this account
in December 1992.  In December 1991, approximately $110,000 was
transferred into this account from Uni-Med #2.  In August 1993,
approximately $602,925 was transferred into this account from the
SAB #2 account.  This account received approximately $94,179 from
the Infinite account in December 1993.  Between June 1993 through
October 1993, approximately $68,007 of this account was paid to
American Express. In September 1993, approximately $33,500 was
paid to Mirage Casino.  Approximately $85,000 was sent from this
account to the Bonanno #2 account.

(h)  **The SAB #2 account** -- According to Citibank
records, this account was opened on May 3, 1993, and was closed
in August 1993.  In addition to receiving Medicare reimbursement
checks based on false claims, see ¶ 29, supra, this account was
used to fund related accounts.  For example, approximately
$133,851 was sent to the Lechium account at Chemical Bank

32

described below, see ¶ 33(k).  Deposits into this account total approximately $1,082,000.

(i)  **The Infinite account** -- According to Citibank records, this account was opened on January 17, 1992, with a $100,000 deposit from the Universal #2 account.  In addition to receiving Medicare reimbursement checks based on false claims, see ¶ 29, supra, this account was used to fund other Universal accounts and payments to principals of Universal, including HARRY ULLRICH, and to receive transfers from related accounts.  For example, on or about February 27, 1992, this account received a $100,000 transfer from the Universal #2 account.  On or about September 11, 1992, approximately $50,000 was transferred into this account from the SAB #1 account.  On September 18, 1992, approximately $25,000 of this account was transferred to a personal account in the name of HARRY ULLRICH.  On or about January 25, 1993, approximately $10,277 of this account was sent to Westchester BMW for the purchase of a new BMW for HARRY ULLRICH.

(j)  **The Lexus account** -- According to Chemical Bank records, this account was opened by Craig Siegel on or about November 2, 1992.  In addition to receiving Medicare reimbursement checks based on false claims, see ¶ 29, supra, this account was used to fund other Universal accounts and to receive transfers from related accounts.  For example, in April 1993, approximately $75,000 was transferred from the Siegel #1 account into this account.  In October 1993, approximately $79,425 from

this account was transferred to the Universal #1 account.   During the months of March and April 1993, approximately $95,000 of this account was transferred into a brokerage account.   Based on a review of a sample of deposits shown in the account records, virtually all of the deposits were received from Medicare reimbursement checks.

        (k)   **The Lechium account** -- According to Chemical Bank records, this account was opened on June 24, 1993 by STEVEN BONANNO, who is the sole signatory.   During June and July 1993, this account received approximately $133,851 from the SAB #2 account.

        (l)   **The Siegel #1 account** -- Based on Chemical Bank records, this account was opened as a joint personal checking account for HAROLD SIEGEL and Frances Siegel.   HAROLD SIEGEL deposits his $2,340.65 weekly paycheck into this account. In November 1990, this account received approximately $350,000 from the Universal #2 account.   Between April 1991 and June 1991, this account received transfers from the Universal #2 account in the amount of approximately $510,000.   On or about September 24, 1991, approximately $400,000 from this account was wired to the Siegel account #2.   In or around January 1992, approximately $100,000 was wire transferred from a Universal account at Merrill Lynch to this account.   In February 1992, approximately $68,000 was transferred into this account from the Infinite account.   In April 1992, approximately $11,646 was transferred to the Siegel #3 account, and in August 1992, approximately $15,485 was

34

transferred to the same account.  Approximately $10,014 was deposited into this account from a personal account of HARRY ULLRICH.  On or about April 14, 1993, approximately $75,000 from this account was transferred to the Lexus account.

(m)  The Siegel #2 account -- This account was opened on November 11, 1988, according to the records of Merrill Lynch.  Between May 1991 through December 1991, this account received $843,676 from the Siegel #1 account. In January 1992, $1,200,000 was transferred from this account to the Siegel #3 account.

(n)  The Siegel #3 account -- In January 1992, this account received $1,200,000 from the Siegel #2 account.  In May and June 1993, $917,777 was transferred to the Siegel #4 account.  In October 1991, $70,058 was transferred to Siegel's account at Vantage Securities.  This account received two deposits from the Siegel #1 account, in April 1992, approximately $11,646 was transferred to this account and in August 1992, approximately $15,485 was transferred into this account. In June 1992, a $33,409 deposit was made into this account from a Merrill Lynch account in the name of Universal Medical Supplies, Inc.

(o)  The Siegel #4 account -- This account is in the name of Frances Siegel, according to the records of Merrill Lynch. In the months of May and June 1993, this account received a total of $917,777 from the Siegel #3 account.

(p)  The Bonanno #1 account -- According to the records of Chemical Bank, this account was opened by Joanne

35

Delponte Bonanno on December 14, 1992 using $15,108.50 from the SAB #1 account.  Two wire transfers were made from this account to the Bonanno #2 account.  On November 9, 1992, $30,000 and on December 31, 1992, $15,000 was transferred to the Bonanno #2 account.

(q)  The Bonanno #2 account -- According to the records of Chemical Bank, Joanne Delponte Bonanno opened this account on December 14, 1992 with $11,686.50 from a Chase Manhattan account.  This account received two wire transfers from the Bonanno #1 account, on November 9, 1992, a transfer in the amount of $30,000 and on December 31, 1992, $15,000 was transferred.  In December 1993, $36,613 was transferred from the Lechium account.  This account receives approximately $11,602 per month from SAB #1 account in checks in equal amounts payable to Steven and Joanne Bonanno and receives approximately $2,727 in payroll checks for Steven from the Universal #3 account. Additionally, approximately $94,531 from this account has been transferred into various Bonanno accounts at Smith Barney. (approximately $21,000 into STEVEN BONNANO's account; approximately $38,400 into an account in the names of STEVEN BONANNO and Nicole Bonanno (who is on information and belief the daughter of STEVEN BONANNO); and approximately $34,000 into an account in the names of STEVEN BONANNO and Michele Bonanno (who is on information and belief the daughter of STEVEN BONANNO).

(r)  The Bonanno #3 account -- STEVEN BONANNO is the sole signatory of this account, according to the records of

36

Smith Barney Shearson.  This account received $16,500 from a closed account in the name of STEVEN BONANNO at Smith Barney. Three transfers of $4,591, $10,216 and $11,044 were received from the Bonanno #2 account.  Approximately $26,000 was transferred into the Smith Barney account in custody for Nicole Bonanno (Bonanno #7).  $21,000 was transferred into the Smith Barney account in custody for Michele Bonanno (Bonanno #6)

(s)  The Bonanno #4 account -- Based on the records of Smith Barney, this account is in custody for Michele Bonanno.  In December 1992, $21,000 was received from the Bonanno #5 account.  This account received two transfers from the Bonanno #2 account, in August 1993, $4,831 was transferred and in November 1993, $10,009 was transferred from the Bonanno #2 account.

(t)  The Bonanno #5 account -- According to the records of Smith Barney, this account is in custody for Nicole Bonanno.  In February 1993, $26,000 was received from the Bonanno #5 account.  This account received two transfers from the Bonanno #2 account, in August 1993, $4,831 was transferred and in November 1993, $10,009 was transferred from the Bonanno #2 account.

### D.  THE ARREST WARRANTS

33.  The following is background information concerning each defendant for whom an arrest warrant is sought:

(a)  As more fully described above, see ¶ 11, defendant HAROLD SIEGEL is the principal owner and operator of

37

Universal.  As described in ¶ 15, SIEGEL helped recruit CI-1 and CI-2 to serve as sales representatives for Universal.  SIEGEL also recruited CI-2 and other doctors to improperly authorize medical equipment, see ¶ 18, supra, and SIEGEL used checks written on Universal accounts pay CI-2 for improperly signing Certificate of Medical Necessity forms, see ¶ 19, supra.

(b)  As more fully described above, see ¶ 11, supra, STEVEN BONANNO handled day-to-day management of Universal, including computer operations and billing.  With support from HAROLD SIEGEL, BONANNO formed SAB, listing himself as owner and president, see ¶ 12(b), supra.  Even after forming SAB, however, BONANNO continued to claim his only employment as Manager of Universal Medical Supplies, Inc., see id.

(c)  As more fully described above, see ¶ 11, supra, HARRY ULLRICH handled the supply operations for Universal. In 1992, ULLRICH formed Infinite, listing himself as president and Paul Wasilewski, who is also listed as an employee for Willis, as one of his employees, see ¶ 12(c), supra.

34.  Based upon the foregoing, I believe there is probable cause to believe that HAROLD SIEGEL, STEVEN BONANNO, and HARRY ULLRICH, the defendants, engaged in an illegal scheme to submit false and fraudulent claims to the Medicare program, to commit mail fraud, and to launder the proceeds of the mail fraud, in violation of Title 18, United States Code, Sections 1001, 1341, 1956, and 1957; and Title 42, United States Code, Section 1320a-7b.

WHEREFORE, the Government requests that warrants issue for the arrest of the above-named individuals so that they may be apprehended and detained or bailed, as the case may be.

### E.   SEARCH WARRANT

35.   According to Empire records, the address for Universal Medical Supplies, Inc., is 30 N. West Street, Mt. Vernon, New York (the PREMISES).  As recently as yesterday, March 21, 1994, I conducted surveillance of the PREMISES, where I observed a multi-story brick building with an entrance clearly identified by the sign "Universal Medical Supply."  According to CI-3, the PREMISES consists of a warehouse, from which Universal conducted its supply operation, and administrative offices, from which Universal conducted its sales and billing operations.  According to CI-3, the PREMISES is the location (i) where HAROLD SIEGEL, STEVEN BONANNO, and HARRY ULLRICH maintained their offices; (ii) where Universal housed its sales, billing, and supply operation, as well as the files and computer records associated with these operations; (iii) where CI-3 and other sales representatives received telephone calls from Medicare beneficiaries, see ¶ 15, supra; (iv) where CI-3 received instructions on how to take the medical history of patients and complete the Universal forms, see ¶ 20, supra; (v) where CI-3 returned with the completed forms for Universal to fill the orders and submit Medicare claims to Empire, see ¶ 17, supra; (vi) where Universal management -- including HAROLD SIEGEL, STEVEN BONANNO, and HARRY ULLRICH -- conducted sales meetings in

39

a conference room located at the PREMISES, including meetings to introduce Universal's new products and encourage the sales representatives to boost their sales, see ¶ 16, supra; and (vii) where CI-3 observed STEVEN BONANNO preparing Medicare billings and files, see ¶ 20 supra.  In conducting surveillance of the PREMISES yesterday morning, I observed a 1994 Infiniti automobile arrive at the PREMISES, which the records of the New York Department of Motor Vehicles ("DMV") show belongs to HAROLD SIEGEL.  I also observed other cars belonging to other Universal employees parked in the vicinity of the PREMISES, which cars I had observed at the PREMISES on previous occasions.  During my surveillance yesterday morning, I also observed a delivery van that DMV records show is registered to Universal Medical Supply leave the PREMISES.  Empire records show that Universal continues to submit claims for reimbursement for durable medical equipment, with its most recent claim forms having been received as recently as last week.

36.  Based on my training, experience and participation in Medicare fraud investigations, as well as my discussions with other experienced agents, I know that DME companies involved in Medicare fraud, mail fraud, and money laundering typically have business records in their offices that include the following documents:  records relating to payments for and distribution of medical supplies eligible for Medicare reimbursement, including invoices, receipts, and payment records; records relating to Medicare reimbursement claims, including Medicare claim forms,

**40**

Certificate of Medical Necessity forms, patient and physician lists, and Medicare codes; records of non-reimbursable items, including invoices, receipts, and payment records; correspondence with any medical providers, beneficiaries and suppliers; telephone records and other records relating to the supply of durable medical equipment to Medicare beneficiaries; employee records, including job descriptions and scripts used in soliciting Medicare beneficiaries; financial records, books, receipts, ledgers, bank records, money orders and cashier's checks, receipts, passbooks, bank checks, keys to safe deposit boxes and other locked containers, and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money; addresses and telephone numbers in books or papers; and other property, documents and things which constitute evidence of the commission of, or are designed or intended as a means of the violation of, or are contraband or the fruit of the violation of the federal laws against false statements to the government, in violation of 18 U.S.C. § 1001; mail fraud, in violation of 18 U.S.C. § 1341; and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and conspiracy to commit and aid and abet these offenses, in violation of 18 U.S.C. §§ 371 and 2.  According to CI-3, Universal maintained its billing records on computer, and Empire records show that Universal submitted its reimbursement claims by electronic data transmission.  Accordingly, there is reason to believe that these records may be contained in computer form, including on floppy discs, magnetic data storage tapes, and

41

associated software and hardware.   Based on the fact that
Universal operates as a DME supplier, I believe that records of
the sort described above will be found at the PREMISES.

37.  Based upon the foregoing, I believe there is
probable cause to believe that, within the PREMISES, there
presently are concealed those items set forth above, which items
constitute evidence, fruits and instrumentalities of violations
of Title 18, United States Code, Sections 1001, 1341, and 1957;
and Title 42, United States Code, Section 1320a-7b.

WHEREFORE, your deponent respectfully requests that
search warrant be issued as applied for herein.

### F.   SEIZURE WARRANTS

39.  The statutory provisions pursuant to which the
defendant accounts are subject to seizure and forfeiture are as
follows:

40.  Title 18, United States Code, Section 981(a)(1)(A)
subjects to forfeiture "[a]ny property real or personal involved
in a transaction or attempted transaction in violation of . . .
section 1956 or 1957 of this title, or any property traceable to
such property."

41.  Title 18, United States Code, Section 1956(a),
commonly known as the "money laundering" statute, imposes a
criminal penalty upon:

42

(a)(1) [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part -- (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law."

42.   The term "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), as (A) any act or activity constituting an offense listed in section 1961(1) of this title.

43.   Title 18, United States Code, Section 1961(1) defines "racketeering activity" to mean:

(B) any act which is indictable under the following provisions of title 18, United States Code: . . . Section 1341 (relating to mail fraud) . . .

44.   Title 18, United States Code, Section 1341 provides, in relevant part, that:

[w]hoever having devised or intending to devise any scheme or artifice to defraud, or by obtaining money or property by means of false or fraudulent pretenses, representations or promises, or to sell or dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article,

43

> or anything represented to be or intimated or
> held out to be such counterfeit or spurious
> article, for the purpose of executing such
> scheme or artifice or attempting to do so,
> places in any post office or authorized
> depository for mail matter, any matter or
> thing whatever to be sent or delivered by the
> Postal Service, or take or receives
> therefrom, any such matter or thing, or
> knowingly causes to be delivered by mail
> according to the direction thereon, or at a
> place at which it is directed to be delivered
> by the person to whom it is addressed . . . .

45. Title 18 U.S.C. § 1957, imposes a criminal penalty upon any person who, "knowingly engages in or attempts to engage in a monetary transaction in criminally derived property that is of a value of greater than $10,000 and is derived from specified unlawful activity."

46. The term "monetary transaction" is defined in 18 U.S.C. § 1957(f)(1) and means the "deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument . . . by, through, or to a financial institution[.]"

47. Based upon the foregoing, I believe there is probable cause to believe that the property described in ¶ 2(c), supra, is property which may be seized pursuant to Title 18, United States Code, Section 981(a)(1). The property described in ¶ 2(c) constitutes property which is "involved in" and/or "traceable" to transactions in violation of the money laundering statutes, Title 18, United States Code, Sections 1956 and 1957. See 18 U.S.C. § 981(a)(1)(A). Moreover, I submit that the property also "constitut[es]" or is "derived from" proceeds

44

traceable to violations of the mail fraud statute, Title 18,
United States Code, Section 1341.  See 18 U.S.C. § 981(a)(1)(B).
With respect to the bank and brokerage accounts identified in ¶
2(c), I submit that the assets have been demonstrated to be
"involved in" the illegal laundering of the proceeds of the mail
fraud because these assets were used in, or were created as the
result of, monetary transactions knowingly engaged in with the
mail fraud proceeds, see 18 U.S.C. § 1957.  In addition, I submit
that the route of the mail fraud proceeds has been traced to each
of the accounts listed in ¶ 2(c).

WHEREFORE, your deponent respectfully requests that the
seizure warrants be issued as applied for herein.

BARRY JERSON
Special Agent
Department of Health and
Human Services

Sworn to before me this
    day of March ___, 1994

UNITED STATES MAGISTRATE JUDGE

45

# APPENDIX

# PRIMARY FLOW OF MONEY

